IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  1:16-CR-00096 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | GOVERNMENT'S TRIAL BRIEF |
| | ) | |
| ROBERT J. JOHNSON, | ) | |
| a.k.a. "POP" | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

The United States of America, by and through its attorneys, Carole S. Rendon, United States Attorney, and Vasile Katsaros and Matthew J. Cronin, Assistant United States Attorneys, hereby submits the following Trial Brief.

**Anticipated Legal Issues**

**A.      Death Resulting Jury Instruction**

The Defendant in this case was charged with an enhanced penalty under 21 U.S.C. § 841(b)(1)(C) for distributing fentanyl to the victim, which was the but-for cause of her death. In *United States v. Burrage*, the Supreme Court held that the drug must have been the but-for cause of the victim's death or injury in order for the enhancement under § 841(b)(1)(C) to apply. 134 S. Ct. 881 (2014).  As the Sixth Circuit held recently in *United States v. Volkman*, 797 F.3d

1

377, 392 (6th Cir. 2015) and reaffirmed recently in *United States v. Smith*, 2016 U.S. App.
LEXIS 13454, at \*6 (6th Cir. July 22, 2016) (unpublished), this simply means that the victim
would have lived "without the incremental effect" of the drug.  *Burrage*, 134 S. Ct. at 888.  In
*Smith*, defendant argued that the government did not prove causation, as the victim named Patty
had "four depressants in her system and the coroner conducted no autopsy."  *Smith*, 2016 U.S.
App. LEXIS 13454, at \*6.  The Sixth Circuit denied this challenge, holding that "the government
need not prove that oxycodone was the sole cause of Patty's death; rather, it need only show that
'without the incremental effect' of the oxycodone, [the victim] would not have died."  *Id.*
(emphasis added) (quoting *Volkman*, 797 F.3d at 395 and *Burrage*, 134 S. Ct. at 888).  In
*Volkman*, defendant challenged the death resulting enhancement on a number of victims to
whom he prescribed Oxycodone, including victims that had multiple drugs in their system at the
time of death and other underlying health issues.  For a victim named Brigner, defendant argued
"Sertraline and haloperidol—two drugs that Volkman did not prescribe but which were found in
Brigner's system—could have been responsible for Brigner's death [and] that underlying heart
conditions, such as cardiomegaly (an enlarged heart) or unstable plaque, could have triggered the
cardiac incident leading to Brigner's death."  The Sixth Circuit rejected this causation argument,
because the United States only had to prove that, if the victim had not taken Oxycodone that day,
she would have lived:

> while the evidence did suggest that Sertraline and haloperidol can be lethal, they
> are only toxic in high doses not present here. The trier of fact could have concluded
> that the levels in Brigner's bloodstream were too low to support such a theory.  By
> contrast, testimony from both Dr. Castro and Dr. Kennedy established that the level
> of oxycodone present in Brigner's blood was toxic or potentially toxic.  Further, as
> with Ross, testimony established that Brigner's final prescription for oxycodone
> represented a significant increase relative to his previous prescriptions. Dr.

2

Kennedy testified that, at this final visit, Volkman increased Brigner's prescription for oxycodone from 30 mg a day to 240 mg a day.  On the same visit, Volkman kept constant his prescriptions for Valium and Soma and increased only slightly the prescription for hydrocodone, from 60 mg to 80 mg.  Third, given the fact that there were no signs of a myocardial infarction—the usual indicator of complications arising from arteriosclerotic cardiovascular disease—a rational trier of fact was not compelled to accept Volkman's argument that an underlying condition led to Brigner's death.

*Id.* at 396-97 (citations omitted).

Based on this binding precedent and in accordance with jury instructions in analogous cases in other districts, the United States respectfully submits the following jury instructions relating to the § 841(b)(1)(C) enhancement:

<u>Death Resulting from Use of Controlled Substance</u>

A.    Charge:

Count 1 of the indictment further alleged that death resulted from defendant's distribution of fentanyl:

> On or about August 25, 2015, in Cleveland, Ohio, IND-1, a person whose identity is known to the grant jury, did fatally ingest and overdose on a controlled substance, namely fentanyl, which ROBERT J. JOHNSON, aka "Pop", had distributed to IND-1. As a result of ROBERT J. JOHNSON, aka "Pop"'s distribution of fentanyl alleged in Count 1, death or serious bodily injury did result from the use of fentanyl, a Schedule II controlled substance, in violation of the enhanced penalty provisions of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

In order to find for the government on this question, the government must prove the additional element that the defendant's conduct resulted in death.  In order to establish that the drugs distributed by defendant resulted in the death of [the victim], the government must prove that [the victim] died as a consequence of his or her use of the drugs that the defendant distributed on or about the dates alleged in the indictment. This means that the government must prove beyond a reasonable doubt that but for the use of the drugs that the defendant distributed,

3

[the victim] would not have died. But-for causation exists where use of the controlled substance combines with other factors to produce death, and death would not have occurred "without the incremental effect" of the controlled substance. The government is not required to prove that the defendant intended to cause the death of [the victim] or that his or her death was foreseeable by the defendant or by others.

      B.     Authority:

      Sand, Siffert, Laughlin and Reiss, *Modern Federal Jury Instructions*, Vol. 3, Section 56.01 Instruction 56-12.1; Fifth Circuit Pattern Criminal Jury Instructions, 2015 Edition, Section 2.93; Tenth Circuit Pattern Criminal Jury Instructions, 2011 Edition, Section 2.85; 2B O'Malley, Grenig, and Lee, *Federal Jury Practice and Instructions* § 64:03 (6th ed. 2015); *Burrage v. United States*, ___ U.S. ___, 134 S. Ct. 881, 887 (2014); *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015).

## B.    Proximate Cause is Not a Defense

      Defendant may allege that he provided the fentanyl to another user, who in turn gave it to the victim. Aside from it being factually inaccurate, this Court should prevent Defendant from arguing to the jury that this alleged fact makes any difference as to his culpability because it is a misstatement of the law and would be both irrelevant and unfairly prejudicial, as it would only serve to confuse the jury. Courts have routinely rejected the notion that proximate causation arguments – namely that the defendant gave the drugs to a middleman who then gave the drugs to the victim – could absolve a defendant of culpability in this context. In *Burrage v. United States*, the Supreme Court noted the two types of causation – but for and proximate cause – and expressly declined to impute proximate causation onto 21 U.S.C. § 841(b)(1)(C). 134 S. Ct. at

4

887.  The Tenth Circuit in *United States v. Burkholder* recently published a lengthy opinion reaffirming that that there is no proximate causation requirement in controlled substances death-resulting cases.  816 F.3d 607, 614 (10th Cir. 2016).  In *Burkholder*, defendant appealed a district court's denial of his proposed jury instruction that the victim's death must be a "reasonably foreseeable consequence" of his drug dealing.  In a lengthy analysis, the court affirmed the district court's denial of the proposed jury instruction, finding that the statutory language, review of other criminal statutes and Supreme Court precedent all clearly indicate that only but for causation is required under 21 U.S.C. § 841(b)(1)(C).  *Id.* at 611-621.  The Court thus held that "the ordinary meaning of 'result[s] from' imposes a requirement of actual or but-for causation, and not proximate causation."  *Id.* at 614 (quoting *United States v. Ramos-Delgado*, 763 F.3d 398, 401 (5th Cir. 2014), cert. denied, 135 S. Ct. 771, 190 L. Ed. 2d 641 (2014)).

Courts across the country have routinely held that it is no defense in a death-resulting case to claim that, while a defendant did provide the drugs that caused the death, he provided it to a middleman and not the victim.  In fact, courts routinely reject such arguments in cases with far more attenuation between the dealer and the victim than in this case.  For instance, in *United States v. Brubaker*, a defendant distributed Oxycodone to a middleman, who then distributed it to the victim.  510 F. Supp. 2d 506, (D. Mont. 2007).  The defendant had no direct contact with the victim and did not know that the victim would obtain or take the drug.  Nevertheless, the court found that defendant's drug trafficking with the middleman was the but for cause of the victim's death.  In doing so, it held that,

> Congress recognized that the risk is inherent in the product and thus it provided that persons who distribute it do so at their peril. It is obvious Congress intended in such a case that the 20-year mandatory minimum would apply if death or serious bodily

injury resulted from the use of the substance without regard for common law proximate cause concepts.

*Id.* at 508 (quoting *United States v. Robinson*, 167 F.3d 824, 826, 831-32 (3rd Cir. 1999)); *see also United States v. Webb*, 655 F.3d 1238, 1250, 1254-55 (11th Cir. 2011) ("[Section] 841(b)(1)(C)'s enhanced penalty requires only proof that the death resulted from the victim's use of a controlled substance dispensed by the defendant").  In this case, by contrast, Defendant knew that the victim's boyfriend and the victim shared any drugs that the other bought.

Accordingly, the government respectfully requests that the Court instruct Defendant and his counsel that they are not permitted to argue or assert in their opening statements or their closing arguments that the jurors should consider proximate causation – namely that Defendant sold the drugs to an intermediary who ultimately provided the drugs to the victim – and, if he does so, offer a curative instruction with the correct statement of the law.

## C.    Government's Proposed Expert Testimony

The United States provided defense counsel with all of the underlying medical records, medical examiner's reports, toxicologist reports, and all other discovery information pertinent to the experts' opinions in May 2016.  At Defendant's request, the United States provided additional documentation on August 23, 2016.  On November 14, 2016, the United States provided additional notice to defense counsel pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) that it may call the following expert witnesses at trial:

1.  <u>Thomas P. Gilson, M.D., F.C.A.P., Medical Examiner & Executive Director of the Regional Forensic Science Laboratory, Cuyahoga County Office of Medical Examiner</u>: Dr. Gilson will testify regarding the anatomic diagnosis of the decedent and cause of death.

2. <u>Andrea McCollom, M.D., Pathologist, Cuyahoga County Office of Medical Examiner</u>: Dr. McCollom will testify regarding the anatomic diagnosis of the decedent and cause of death.

3. <u>Harold E. Schueler, Ph.D., Chief Forensic Toxicologist, Cuyahoga County Regional Forensic Science Laboratory</u>: Dr. Schueler will testify regarding the toxicology analysis performed relating to the decedent.

4. <u>Joan Papp, M.D., F.A.C.E.P., MetroHealth Emergency Room Physician, Medical Director of Project DAWN</u>: Dr. Papp will testify regarding the symptomology of individuals who died or are dying from opioid overdoses.  Dr. Papp is expected to testify regarding the decedent's cause of death based upon a review of the decedent's medical record.

5. <u>Erin Miller, B.S., Forensic Science, Forensic Scientist II, Cuyahoga County Medical Examiner's Office:</u>  Ms. Miller will testify regarding the chemical analysis of controlled substances in this case.  She will testify regarding the procedures used to conduct the testing in the laboratory and the results of that testing.

Defense counsel likewise has their qualifications and findings.  The United States anticipates that these witnesses will testify within their areas of expertise on the subject matters listed above. *See* Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue"); *United States v. Schneider*, 704 F.3d 1287, 1291 (10th Cir. 2013) (holding that medical expert may opine on the cause of death, including when the cause of death is an element or otherwise a matter of dispute at trial).  One or more of these witnesses may be called on rebuttal to testify about the reliability of the opposing experts' opinions.  *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 63185 at *1 (D. Kan. June 9, 2009) HN7 ("Numerous courts have permitted experts to testify at trial about the reliability of the opinions of opposing experts" (collecting cases)).

**D.**     **Defendant's Proposed Expert Testimony**

1.     *Daubert* Forbids Defendant's Proposed Expert Richard Belloto from Testifying About the Victim's Cause of Death

It is the United States' understanding that Defendant plans to offer Robert J. Belloto, Jr. as an expert witness.  Belloto has a Ph.D. and Masters in Pharmacy from Ohio State University, a Masters in Mathematics from the University of Toledo, and a Bachelors degree from Ohio State University. He is not a medical doctor and has no medical training.  Based on Belloto's report, it appears that defense counsel plans to have this expert offer his opinion on two subjects: (1) the victim's cause of death (including that she may have died of a heart attack) and (2) the postmortem concentration of fentanyl in the victim's system.  (*See* Gov. Ex. 1: Belloto Report, p. 3) ("The fact that she was found with her underwear at her knees indicates that an acute event occurred such as sudden cardiac death"); *id.* at 2 ("Given the wide ranging half-life of fentanyl, it certainly is possible that she ingested it an earlier time as stated"); *id* at 3 ("[t]o a reasonable degree of pharmacological and toxicological certainty, [the victim] did not die from a fentanyl overdose as the postmortem levels are falsely elevated")).  Based on its present understanding of Belloto's education and background, the United States does not object to him offering testimony about the postmortem concentration of fentanyl in the victim's system.  The United States does object to Belloto – who has no medical training and has never provided anyone with professional medical care – opining on the cause of death and moves to exclude him from making any such testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993).

Rule 702, which incorporates the Supreme Court's *Daubert* holding, establishes the criteria for a witness to testify as an expert:

8

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also* United States v. Stafford, 721 F.3d 380, 393 (6th Cir. 2013) ("[d]istrict courts have broad latitude in deciding whether to admit expert testimony under *Daubert*" and "such decisions are similarly reviewed under the abuse-of-discretion standard").

Rule 702 gives the district courts the role of gatekeeper and charges the court with ensuring that only expert testimony that "rests on a reliable foundation and is relevant to the task at hand" is admitted.  *United States v. Langan*, 263 F.3d 613, 620 (6th Cir. 2001) (quoting *Daubert*, 509 U.S. at 597).  The Sixth Circuit has noted that trial courts have a "special obligation [. . .] to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *United States v. Harris*, 192 F.3d 580, 588 (6th Cir. 1999) (internal quotation and citation omitted).  *See also Kumho Tire Co.*, *v. Carmichael*, 526 U.S. 137 (1999) (extending *Daubert's* reliability and relevance standards to non-scientific experts.); *see, e.g.*, *Pride v. BIC Corp.*, 218 F.3d 566 (6th Cir. 2000) (affirming district court's exclusion of expert whose methodologies were too unreliable under abuse of discretion standard); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011) (affirming district court's exclusion of expert when court could not verify reliability of expert's methodology).

Belloto, who is a pharmacist, lacks the "knowledge, skill, experience, training, or education" that would allow him to testify about the victim's cause of death.  Fed. R. Evid.

9

702(a).  Courts routinely exclude proposed expert testimony as to cause of death when the expert lacks the necessary "knowledge, skill, experience, training, or education" to make that finding. *Id.*  For instance, in *United States v. Zolot*, a court excluded a forensic toxicologist from opining that cardiovascular disease was a potential cause of death in an opioid death case.  968 F. Supp. 2d 411, 426-27 (D. Mass. 2013).  The forensic toxicologist was attempting to draw this conclusion based on the medical records and medical examiner report.  Despite the fact that the forensic toxicologist had worked for over 20 years in the state's medical examiner office, including as chief toxicologist, the court held that the forensic toxicologist "cannot simply repeat a medical examiner's opinion as the only basis for his own opinion that there was another medical cause of death, unless he has the expertise to independently reach that conclusion. There is no evidence that [the forensic toxicologist] is an expert in cardiovascular disease." *Id.* at 427.  Furthermore, the court held that the forensic toxicologist cannot simply rely on the medical examiner report unless he has the medical expertise to reach the cause of death conclusion on his own. *Id.* at 426 ("[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science") (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)).

In this case, Belloto is a pharmacist with no known expertise, training, or experience in forensics, let alone the medical expertise needed to opine on cardiovascular or any other cause of death.  His curriculum vitae states that his full-time job for the past 11 years is a staff pharmacist at "Good Samaritan Hospital," where he "prepare[s] and check[s] orders, drug charts, intravenous admixtures and chemotherapy," among other non-forensic tasks.  (Gov. Ex. 2: Belloto CV).  The only experience in forensics listed is "providing toxicology consultations

10

*concerning drug effects*, opinion letters, and testimony in court and administrative hearings" as part of his part-time work as a litigation consultant.  (*Id.*)  (emphasis added).  And even then, he is only opining on the effects of the drug, not a cause of death.  Thus, as far as the documents Defendant provided show, this would be the first instance where Belloto would make any determination as to cause of death.  Even more so than the forensic toxicologist in *Zolot*, Belloto lacks the "knowledge, skill, experience, training, or education" needed for him to testify about the victim's cause of death.

Belloto also fails the remaining three prongs of Federal Rule of Evidence 702.  His proposed testimony is not "based on sufficient facts or data."  Fed R. Evid. 702(b).  His report only mentions one page of a police report when inferring the time that the victim ingested the fentanyl and seems to either avoid or unintentionally omit references to any of the other evidence available establishing the time of ingestion and death.  (Gov. Ex. 1: Belloto Report, p. 2).  He also fails to reference the repeated evidence of fentanyl overdose-related symptoms found in the medical reports, making his underlying data set incomplete at best.  (*Id.*)  His testimony also is neither the "product of reliable principles and methods" (Fed R. Evid. 702(c)) nor "reliably applied the principles and methods to the facts of the case."  Fed R. Evid. 702(d).  In fact, it is hard to determine Belloto's methodology from the report as it relates to cause of death.  He merely mentions that (1) he thinks the fentanyl was ingested earlier and that, as a result, she probably did not die from it; and (2) cardiomegaly was mentioned in the medical examiner's report, and therefore a heart condition could be the cause of death.  (*Id.*)  Both of these conclusions were made bereft of any apparent methodology or analysis.  Instead, he pulled out two pieces of information out of context from separate reports and drew conclusions from them

11

whole cloth.  "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science." *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 614.  Just as was the case in *Zolot*, Belloto cannot rely on the medical examiner report to determine the cause of death unless he has the medical expertise to reach the cause of death conclusion on his own.

Belloto lacks the expertise to opine on the victim's cause of death.  He formed his opinion lacking expertise and proper methodology, thereby offering no probative value to the jury.  Furthermore, allowing the jury to hear such testimony poses a substantial risk of confusing and misleading the jury. *See Daubert*, 509 U.S. at 595; *Frazier*, 387 F.3d at 1263 (exclusion appropriate if probative value of evidence is substantially outweighed by potential to confuse or mislead jury).  "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Id.*

The United States therefore respectfully requests that this Court exclude any testimony Belloto would give as to cause of death.

2.     Proposed Defense Expert Benjamin Corpus

On November 28, 2016, defense counsel notified the United States that he intends to call Benjamin Corpus who is affiliated with Toxicology Associates, Inc. as an expert.  The government has not received any CV, report, or any other material concerning Mr. Corpus.  At this time, it is unclear what opinion he would offer.  In a public records search, however, it found numerous disquieting articles and court papers relating to a Benjamin Corpus affiliated with Toxicology Associates, Inc. who attempted to be qualified as an expert in toxicology and

chemistry.  For instance, in *Woods v. Wills* (1:03-cv-00105) (EDMO 2005), the court excluded

Mr. Corpus' proposed testimony relating to hair samples due to his lack of qualifications and

methodology.  (*See, e.g.*,  Gov. Ex. 3: Order Excluding Benjamin Corpus' Expert Testimony)

(available at https://www.gpo.gov/fdsys/pkg/USCOURTS-moed-1_03-cv-

00105/pdf/USCOURTS-moed-1_03-cv-00105-0.pdf) (noting that Corpus only has a "has a B.S.

degree in microbiology"); *see also* Athens News, Lab That Tested OU Coach's Hair Has Had Its

Share Of Run-Ins With Regulators (*available at* http://www.athensnews.com/news/local/lab-

that-tested-ou-coach-s-hair-has-had-its/article_58c1bac3-b017-58ed-b2d0-84cdf3ce4df0.html)

(summarizing numerous problems Benjamin Corpus and Toxicology Associates has had with the

FDA and other regulators).  It is unclear if this is the same Benjamin Corpus affiliated with

Toxicology Associates, Inc.  And it is unknown if Mr. Corpus has bolstered his qualifications

since that time and would otherwise reach *Daubert*'s exacting standards.  That said, the United

States hereby notices this Court that it may seek Mr. Corpus' exclusion as an expert witness if it

appears that he lacks the qualifications or methodology needed to opine on issues in this case.

**E.**     **Introduction of Victim Photographs**

The United States anticipates that one of the main issues at trial is whether the fentanyl

that Defendant sold to the victim caused her death.  One of the most probative pieces of evidence

relating to the cause of death is the state of the victim's body after she died.  The United States

anticipates putting into evidence several clinical photographs taken of the victim at the coroner's

office where she is lying flat on an examination table.  These photographs are highly probative of

the cause of the victim's death.  They show the victim with blood coming out of her nose and

mouth, a primary sign of opioid-related death.  They also show the pallor of her skin, the track

marks related to opioid injections, and the lack of any indicators that there was any other cause

of death.  These are all critical bases that the United States' experts used as part of their

evaluation of the victim's cause of death.  They are therefore highly probative exhibits that are

critical to the government's case.

The Federal Rules of evidence are clear: evidence that has probative value relating to the

case must be included unless "its probative value is _substantially_ outweighed by the danger of

_unfair_ prejudice." Fed. R. Evid. 403 (emphasis added).  Unfair prejudice has nothing to do with

whether it makes it more difficult for a party to prove its case or raise a defense.  Otherwise, all

evidence would be unfairly prejudicial.  On the contrary, the Supreme Court held that "[t]he term

'unfair prejudice' [. . .] speaks to the capacity of some concededly relevant evidence to lure the

factfinder into declaring guilt on a ground different from proof specific to the offense charged,"

such as on the basis of emotion.  _Old Chief v. United States_, 519 U.S. 172, 180 (1997).  "Because

all probative evidence is to some extent prejudicial, [courts have] consistently emphasized that

Rule 403 balancing turns on whether the prejudice is _unfair_."  _United States v. Eads_, 729 F.3d

769, 777 (7th Cir. 2013) (citation omitted) (emphasis in original).  In this case, the clinical

photographs are an essential component of showing the jury the nature of the victim's death and

corroborating the observations of the medical examiners.  Furthermore, they are not unfairly

prejudicial.  The photographs are clinical in nature and designed to aid in the evaluation of the

victim's death.  They include no sensational or inflammatory content that would prevent a jury,

who are presumed under law to follow their instructions, from using the clinical photographs for

their proper purpose.

14

Courts routinely admit photographs in death cases that are significantly more graphic and likely to arouse emotion in the jury. *See, e.g.*, *United States v. McVeigh*, 153 F.3d 1166, 1203 (10th Cir. 1998) ("even 'graphic depictions' of murder are relevant to support 'other evidence about how the crime occurred, even when the element is uncontested – indeed, even when the defendant offers to admit to the element'") (quoting *Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir. 1997)); *United States v. Fields*, 483 F.3d 313, 355-56 (5th Cir. 2007) (despite the fact that some of the points made by photos were not in dispute, the government needed the photos to demonstrate that the body had decomposed too much for much physical evidence to be found, a point made more effectively with images rather than vague generalizations). These pictures allow the United States to present to the jury a more complete, visual picture of events as opposed to relatively vague testimony, enabling their deliberative process. The jury will expect to see photos of the deceased as it relates to her medical examination and may hold the failure to produce such photos against the government. *Gonzalez*, 127 F.3d at 621 (two photos of dead men on the sidewalk riddled by bullets were admissible because "limiting the proofs to clinically abstract propositions may prevent the jurors from acquiring an accurate picture of events, and that disappointing their expectations about what evidence would normally be available to establish a proposition may lead them to draw inaccurate inference about what actually happened (based on conjectures about why evidence is being hidden from their view)"); *Old Chief*, 519 U.S. at 188 (government is entitled to present relevant evidence regardless of stipulation because "there lies the need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be [. . .] A prosecutor who fails to produce [such expected evidence], or some good reason for his failure, has something to be concerned about" because "triers of fact

15

may penalize the party who disappoints them by drawing a negative inference against that party").

> The United States therefore respectfully requests that the Court permit it to introduce photographs of the deceased into evidence.

### F.    Use of "Inextricably Intertwined" or otherwise Essential *Res Gestae* Evidence

> The United States anticipates introducing evidence that is inextricably intertwined or otherwise *res gestae* background evidence essential for the jury to understand the underlying events.  In particular, the United States anticipates showing the jury that Defendant was the victim's and her boyfriend's drug dealer for a period of time leading up to the victim's death and that Defendant had conversations with an associate regarding drugs he purchased prior to distributing the drugs to the victim.  This evidence is essential to show the jury that it was Defendant who supplied the victim with the fatal fentanyl.  The Sixth Circuit has deemed that Rule 404 of the Federal Rules of Evidence does not bar "background" or res gestae evidence.  In *United States v. Hardy*, the Sixth Circuit announced, "[t]his court has previously recognized the propriety of introducing 'background' evidence.  Such evidence, often referred to as 'res gestae' does not implicate Rule 404(b)."  228 F.3d 745, 748 (6th Cir. 2000) (*citing United States v. Buchanan*, 213 F.3d 302, 311 (6th Cir. 2000); *United States v. Hajal*, 555 F.2d 558, 568 (6th Cir. 1977) (Other acts may be so much a part of the res gestae of a crime that they should be admitted).  The *Hardy* court then explains:

> > Rather, the very definition of what constitutes background evidence contains inherent limitations. *Buchanan, Paulino* and other cases dealing with this issue teach that background or *res gestae* evidence consists of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense.

16

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. **Typically, such evidence is** a prelude to the charged offense, is **directly probative of the charged offense**, arises from the same events as the charged offense, **forms an integral part of a witness's testimony, or completes the story of the charged offense**.

228 F.3d at 748 (emphasis added) (*citing* 2 Jack B. Weinstein, Margaret A. Berger & Joseph M. McLaughlin, *Weinstein's Federal Evidence*, § 404.20[2][c] and [d]; *United States v. Weinstock*, 153 F.3d 272, 277 (6th Cir.1998); *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir.1995); *United States v. Townsend*, 796 F.2d 158, 162 (6th Cir.1986); *United States v. Cunningham*, 103 F.3d 553, 557 (7th Cir.1996); and Jennifer Y. Schuster, *Uncharged Misconduct Under Rule 404(b): The Admissibility of Inextricably Intertwined Evidence,* 42 U. Miami Law Review 947 (March/May 1998) (*See United States v. Rice*, 2004 WL 333800 (6th Cir. 2004).  Therefore, evidence of background, res gestae, or a continuing pattern of illegal activity is properly admissible as it is not precluded by Rule 404(a) of the Federal Rules of Evidence.  In this case, understanding the victim's and her boyfriend's relationship with Defendant as their drug supplier at that time is essential to the government's proof and needed for the jury to properly deliberate with all appropriate evidence.  The jury needs this information to properly deliberate on who provided the fatal dosage of fentanyl.  It is "directly probative of the charged offense," "forms an integral part of witnesses' testimony," and is necessary to "complete[] the story of the charged offense."  *Hardy*, 228 F.3d at 748.  The United States therefore anticipates offering this information into evidence on these grounds.

The aforementioned evidence is also inextricably intertwined with the underlying case. In *United States v. Barnes*, the Sixth Circuit held:

> [T]he Court of Appeals explained that Rule 404(b) does not apply where the

17

> challenged evidence is "inextricably intertwined" with evidence of the crime charged in the indictment. When the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed "extrinsic." "Intrinsic" acts on the other hand, are those that are part of a single criminal episode.

49 F.3d 1144, 1149 (6th Cir. 1995) (*citing United States v. Torres*, 685 F.2d 921, 924 (5th Cir. 1982); *United States v. Henderson*, 626 F.3d 326 (6th Cir. 2010) ("Where the challenged evidence is 'intrinsic' to, or 'inextricably intertwined' with evidence of, the crime charged, Rule 404(b) is not applicable"). Since *Barnes*, the Sixth Circuit has refined its definition of intrinsic acts. In *United States v. Daulton*, the Court announced, "[e]vidence is inextricably intertwined when the charged conduct and the uncharged conduct 'are part of the single criminal episode or the other acts were necessary preliminaries to the crime charged.'" 266 Fed. Appx. 381 (6th Cir. 2008) (unpublished) (emphasis added) (*quoting United States v. Williams*, 900 F.2d, 823, 825 (5th Cir. 1990)); *United States v. Rozin*, 664 F.3d 1052 (6th Cir. 2012) (in tax fraud case, evidence of prior year activities not 404(b), but rather intrinsic evidence); *United States v. Monsour*, 893 F.2d 126 (6th Cir. 1990) (investigative link evidence, such as the defendant acting "suspiciously" at another bank branch a few days prior to the robbery, was intrinsic evidence). Therefore, when other acts are "intrinsic" to charged conduct or part of a single criminal episode they are "inextricably intertwined" and not subject to a Rule 404(b) analysis. In other instances, evidence is intrinsic when exclusion would leave a "chronological or conceptual void in the story of the crime," *United States v. Ojomo*, 332 F.3d 485, 488-89 (7th Cir. 2003), or when the acts complete the story of the crime on trial. *United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002), or explains the circumstances of the case. *United States v. Holt*, 460 F.3d 934 (7th Cir. 2006); *United States v. Poulsen*, 655 F.3d 492 (6th Cir. 2011) (evidence from defendant's related

18

separate obstruction of justice case admissible as 404(b) consciousness of guilt evidence in his securities case); *United States v. Martinez*, 430 F.3d 317 (6th Cir. 2005) (evidence that part of the conspiracy is not "other acts" evidence).  In this case, the drug supplier relationship between the Defendant and the victim and her boyfriend is essential evidence needed for the jury to ascertain who provided the fatal fentanyl.  It completes the story of the crime on trial (*Senffner*, 280 F.3d at 764) and its absence would leave a chronological or conceptual void in the story. *Ojomo*, 332 F.3d at 488-89.  It is also necessary to explain the circumstances of the case.  *Holt*, 460 F.3d at 934.

Accordingly, the United States respectfully moves this Court for a ruling that the evidence it intends to offer as "inextricably intertwined" or *res gestae* evidence be admitted during the course of the jury trial.  In the event the Court finds the United States' proposed evidence is not admissible on those grounds, the government then moves this Court to allow the introduction of all the categories of evidence identified in this pleading as Rule 404(b) evidence to show defendants' intent, plan, knowledge, modus operandi, or absence of mistake that Defendant was the victim's and her boyfriend's drug dealer for a period of time leading up to the victim's death and that Defendant had conversations with an associate regarding drugs he purchased prior to distributing the drugs to the victim.

## G.    Defendant Cannot Attempt Jury Nullification

Defendants have no right to present a nullification defense, or to introduce evidence or testimony for the purpose of inviting jury nullification.  That includes arguing that a drug user assumes the risk of death when taking drugs, which is a gross misstatement of the law.  Congress did not include any such defense when it enacted 21 U.S.C. § 841(b)(1)(C).  In fact, Congress

created the opposite legal regime: when dealers provide drugs to users, under the law the dealer assumes the risk that the user may die and, as a result, the dealer could be subject to an enhanced penalty.  *See Burrage*, 134 S. Ct. at 881; *Volkman*, 797 F.3d at 377 (all that is required is showing that, without the "incremental effect" of the drugs that defendant provided, the victim would have lived); *Burkholder*, 816 F.3d at 607.

It is also improper for defense counsel to mention Defendant's potential sentence.  The Sixth Circuit has made clear that any mention of a Defendant's potential punishment during trial is improper.  *See United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999); *see also* Sixth Circuit Pattern Jury Instruction 8.05, Punishment ("Deciding what the punishment should be is my job, not yours. It would violate your oaths as jurors to even consider the possible punishment in deciding your verdict").  There is no basis for the jury to hear this information.  *See United States v. Calhoun*, 49 F.3d 231, 236 n.6 (6th Cir. 1995) (district court did not err in refusing to permit defendant to argue for jury nullification; the "trial court is surely not required to instruct the jury, as requested by appellant, that it has the power 'not to follow the instructions of the court,' or that the jury 'has a general veto power.'" (citation omitted)); *see also United States v. Johnson*, 62 F.3d 849, 850-51 (6th Cir. 1995) (not error to refuse to instruct jury on issue that invited jury nullification); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir.1993) ("A trial judge . . . may block defense attorneys' attempts to serenade a jury with the siren song of nullification").

Accordingly, the government respectfully requests that the Court instruct Defendant and his counsel that they are not permitted to argue or assert or otherwise present these or similar improper nullification arguments to the jury.

20

H.      **Summary Exhibits**

The United States anticipates offering for admission one or more summary exhibits.  In particular, the United States anticipates seeking admission of one or more exhibits that summarizes relevant portions of phone text and call data.  Summary exhibits are admissible as evidence without a limiting instruction so long as the following conditions are met: (1) the underlying data is voluminous enough to make it difficult for the trier of fact to conveniently examine it in court; (2) the underlying data must also have been made available to the opposing party; (3) the underlying data is admissible (but not necessarily admitted); (4) the data is presented accurately (i.e., it is not erroneous and does not include conclusions as to guilt within the text); and (5) the person who prepared the summary or supervised its preparation should offer it into evidence.  *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) (minor errors go to weight, not admissibility); *United States v. Scales,* 594 F.2d 558 (6th Cir. 1979) ("There is no requirement in Rule 1006, however, that it be literally impossible to examine the underlying records before a summary or charts may be utilized.  All that is required for the rule to apply is that the underlying 'writings' be 'voluminous' and that in-court examination not be convenient."); Fed. R. Evid. 1006.

The United States has phone data reports relevant to this case that are thousands of pages long.  Even an abbreviated version limited to the few days around the events in question would still be voluminous.  These reports therefore qualify as voluminous documents that cannot conveniently be examined in court.  This data was provided to Defendant months ago pursuant to the United States' discovery obligation.  The United States will offer the underlying relevant phone call and text information into evidence beforehand.  The summary exhibits are merely a

21

summary of relevant calls and texts that would allow the jury to examine the underlying admissible evidence in a non-burdensome manner.  A witness who created or otherwise supervised the creation of the summary exhibits will authentic the document, explain the data's reliability, and explain how they were prepared in relation to the voluminous reports.  *Badgett v. Rent-Way, Inc.*, 350 F Supp 2d 642 (W.D. Pa. 2004) (documents offered as summaries under FRE 1006 are necessarily selective compilations of relevant information created for litigation purposes—indeed, that is very reason for their existence); *see also United States v. Strissel*, 920 F2d 1162 (4th Cir. Md. 1990) (summary evidence may be admissible even though not all underlying documentation has been admitted so long as underlying evidence is admissible and available to opponent so that proper cross-examination may be had).  Additionally, the United States needs to provide the jury this evidence in this manner, as otherwise the other calls and texts that are related to Defendant's other criminal activities but not immediately relevant to this case would be included as evidence and could result in the jury being unfairly prejudiced against the Defendant.

Unlike a mere illustrative aid, the proposed summary exhibits are a summary of actual voluminous admissible evidence that the United States anticipates admitting as evidence.  It is therefore fully admissible as an exhibit and may go back with the jury during deliberations without a limiting instruction.  *Bray*, 139 F.3d at 1110.  There are also no issues with the underlying data's admissibility.  The phone reports that the United States would seek to admit are either admissions of a party opponent, the witnesses' own statements and actions, or data generated by a computer.  Data generated by a computer cannot be hearsay and is not testimonial.  *See United States v. Hamilton*, 413 F.3d 1138 (10th Cir. 2005) (information

22

generated by a computer without input from a person is not a statement and does not involve a declarant, placing such information outside the definition of hearsay); *United States v. Khorozian*, 333 F.3d 498 (3d Cir. 2003) (same); *see also United States v. Meyers*, 847 F2d 1408 (9th Cir. 1988) (since surveillance reports, although not admitted, were admissible under business record exception to hearsay rule stated in Rule 803(6), chart summarizing phone calls and events observed by surveillance teams is admissible under Rule 1006).   The calls establishing the timeline of events is furthermore a core part of the investigation and thus intrinsic res gestae to the case.

The United States therefore anticipates seeking the admission of these exhibits at trial.

## I.     Government Representative and Separation of Witnesses

The United States respectfully requests that this Court issue a separation-of-witness order pursuant to Federal Rule of Evidence 615 and designates Cleveland Police Department Detective Thomas Klamert as its representative in this case to be present at counsel table throughout the trial.  His presence in the courtroom during trial is essential to the presentation of the United States' case.  *See* FED. R. EVID. 615(b) (specifically excluding from a sequestration order "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); FED. R. EVID. 615(c) (providing an additional exception for essential witnesses).

### Estimate of Trial Length

The United States anticipates that its case in chief should take no longer than three days.

### Voir Dire

The United States has filed its proposed voir dire questions.

23

## Stipulations

It is the United States' understanding that Defendant does not wish to stipulate to any facts.

## Jury Instructions

The United States has filed its proposed jury instructions.  It provided the jury instructions to defense counsel on November 31, 2016.  At this time, defense counsel has not noted any objections to the proposed instructions.


Respectfully submitted,

CAROLE S. RENDON
UNITED STATES ATTORNEY

By:    /s/ Matthew J. Cronin
          Matthew J. Cronin (VA: 80267)
          Vasile Katsaros
          Assistant U.S. Attorneys
          United States Court House
          801 West Superior Avenue, Suite 400
          Cleveland, OH 44113
          (216) 622-3955
          (216) 522-8355 (facsimile)
          Matthew.Cronin@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2016, a copy of the foregoing document was filed

electronically.  Notice of this filing will be sent to all parties by email.

/s/ Matthew J. Cronin
Matthew J. Cronin
Assistant U.S. Attorney

25